[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2010
JOHN LEY
CLERK

_____

No. 09-12035

_____

D. C. Docket No. 08-10076-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIETEN MENDOZA ZALDIVAR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 24, 2010)

Before BARKETT and MARCUS, Circuit Judges, and HOOD,* District Judge.

BARKETT, Circuit Judge:

_____

* Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Elieten Mendoza Zaldivar appeals from his seventy-month sentence imposed following his written guilty plea and conviction for conspiracy to encourage or induce aliens to enter the United States, knowing or in reckless disregard of the fact that such entry is or will be in violation of law, which conduct resulted in the death of Radilberto Quevedo Garcia, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(iv), and 1324(a)(1)(B)(iv).

Zaldivar raises two issues pertaining to his sentence. First he argues that the district court erroneously applied a ten-level enhancement pursuant to U.S.S.G. § 2L1.1(b)(7)(D) based on the death of Garcia which occurred during the smuggling operation. He also argues that the district court clearly erred in failing to find that he committed the offense for a reason "other than for profit" and thereby denied his request for a three-level reduction, pursuant to U.S.S.G. § 2L1.1(b)(1).

I. Factual and Procedural Background

On the evening of September 23, 2008, about forty-five miles off the coast of Key Largo, Florida, three United States Coast Guard ("Coast Guard") cutters attempted to interdict three boats that they suspected of alien smuggling. The Coast Guard had been alerted to the possible smuggling operation by an agent with Customs and Border Protection ("CBP") after CBP detected two boats rafted together, one, later identified as a thirty-three foot Wellfoot "Scarab" sport vessel,

with a large number of persons on board and the other, later identified as a thirty-one foot Chris Craft vessel, with only two or three persons on board. A third boat, later identified as a twenty-five foot Sea Fox vessel, arrived soon thereafter and rafted with the other two boats. The three boats remained rafted together without their lights on for about another hour and a half after which they began to head northwest toward the United States. The Sea Fox and the Chris Craft traveled with their navigational lights on about one mile in front of the Scarab, which contained the thirty-two Cubans and traveled without its lights on.

While CBP continued to track the progress of the three boats, the Coast Guard was alerted and began to prepare to intercept them. Upon the Coast Guard's initial command for the three boats to stop, the Scarab increased its speed and was pursued by a Coast Guard cutter for about thirty minutes until it stopped. The Sea Fox stopped immediately upon command and the Chris Craft stopped after a brief pursuit by the Coast Guard.

The Chris Craft had two persons on board, Humberto Carranza and its owner and captain, Reynaldo Crespo Marquez, who claimed to have been fishing although only a tackle box with rusted hooks, four fishing rods but no bait or fish, a fileting knife, IDs, and a satellite phone were found on board. The Sea Fox was occupied by the boat's driver, Michael Madrigal Lopez, and two crew members,

Arley Ceballo Gonzalez and Brainer Gomez Cruz. They, too, claimed to have been fishing and became lost. The officer who surveyed the boat found fishing rods that were not rigged, some dive gear, a GPS unit, a red five-gallon container filled with gas, and a satellite phone.[1]

The Scarab, which had not stopped upon the Coast Guard's command, raced away at a high rate of speed in the rough seas. Another Coast Guard cutter pursued the Scarab for about thirty minutes when the Scarab finally stopped. The Scarab had thirty-four occupants on board, including thirty-two Cubans, the defendant Zaldivar, and the boat's operator, Alexis Viscaino Cervantes. As soon as the Coast Guard came upon the Scarab, the individuals on board the boat notified the Coast Guard that one of the Cubans, later identified as Radilberto Quevedo Garcia, had been seriously injured during the chase and was bleeding from his head. The Coast Guard arranged for Garcia to be airlifted to Florida for medical treatment, where, upon his arrival, he was pronounced dead as a result of blunt head trauma.

In his written plea agreement, Zaldivar pled guilty to Count 1 of the Indictment which specifically charged that he and several co-defendants

---

[1] All of the members of the Sea Fox and Chris Craft were charged as members of this same alien smuggling conspiracy and for thirty-two substantive counts of alien smuggling. Marquez, like Zaldivar, pled guilty before trial and the other four defendants, Gonzalez, Carranza, Cruz, and Lopez proceeded to trial and were convicted on all counts. Gonzalez, Carranza, and Cruz have each appealed their convictions and sentences, which appeal was heard and decided by this same panel.

did knowingly conspire, confederate, and agree with each other, to commit an offense against the United States, that is, to encourage and induce an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and resident is and will be in violation of law, with said conduct resulting in the death of Radilberto Quevedo Garcia, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(iv); all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I).

In a written statement in support of his downward adjustment for acceptance of responsibility, Zaldivar stated that he was aware the Cubans were not allowed to legally enter the United States, that he was not the person who operated the Scarab boat when it was fleeing from the Coast Guard, and that he requested the driver to stop for the Coast Guard. He stated that the reason he went on this trip was to bring his wife and two daughters from Cuba to the United States, but for unknown reasons was not able to pick them up.

Zaldivar's Pre-Sentencing Investigation Report ("PSI") assigned him a base offense level of 12, which was increased by six levels based on the number of aliens involved in the smuggling operation. The PSI increased the offense level by another two levels pursuant to § 2L1.1(b)(6) because the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person. The PSI increased the offense level by another ten,

5

pursuant to § 2L1.1(b)(7)(D) because the offense resulted in the death of one of the aliens. Zaldivar was also granted a three level reduction because of his acceptance of responsibility.

Zaldivar objected to the PSI's failure to reduce his offense level pursuant to § 2L1.1(b)(1) because he argued he committed this offense for a reason "other than for profit." He also objected to the ten-level increase to his base offense level because of Garcia's death, arguing that it was the boat's operator, Cervantes, who caused the death and not him. The district court accepted the PSI, rejected Zaldivar's objections, and sentenced Zaldivar to seventy-months' imprisonment.

## II. Discussion

On appeal, Zaldivar challenges the district court's imposition of the ten-level enhancement pursuant to § 2L1.1(b)(7)(D) and its refusal to grant him a three-level reduction pursuant to § 2L1.1(b)(1).

We review the district court's legal interpretations of the Sentencing Guidelines under a de novo standard of review, United States v. De La Cruz Suarez, 601 F.3d 1202, 1219 (11th Cir. 2010), and we must accept its factual determinations unless they are clearly erroneous, United States v. Caraballo, 595 F.3d 1214, 1230 (11th Cir. 2010). The district court's application of the Sentencing Guidelines to those facts is subject to de novo review. Id.

6

A.  Sentencing Enhancement for the Death of Radilberto Quevedo Garcia

Zaldivar first argues that the district court erred in adding a ten-level enhancement to his sentence based on the death of Garcia, one of the thirty-two Cubans on board the same boat as Zaldivar.  He argues that because Cervantes was the sole operator of the Scarab and because he claims he pleaded with Cervantes to stop the boat, his actions did not cause Garcia's death, and thus the district court erroneously applied § 2L1.1(b)(7) to him.

This circuit has not explicitly addressed whether § 2L1.1(b)(7) requires an automatic application regardless of the causal connection between the defendant's actions and the death or serious injury of an alien.[2]  The specific offense characteristic of the Sentencing Guidelines pertaining to the smuggling of aliens states that "[i]f any person died or sustained bodily injury, increase the offense level according to the seriousness of the injury: . . . (D) [If] [d]eath add 10 levels." § 2L1.1(b)(7).

The government argues that this enhancement must be applied in the context of the "relevant conduct" provision of the Sentencing Guidelines, U.S.S.G. §

---

[2] This Court has noted in an unpublished opinion that a circuit split exists as to whether this sentencing enhancement requires a showing that the defendant's conduct was the proximate cause of the death or whether the death was reasonably foreseeable. See United States v. Rodriguez, 203 F. App'x 309, 314 n.3, 2006 WL 3078934,*4 n.3 (11th Cir. 2006) (citing United States v. Flores-Flores, 356 F.3d 861, 862-63 (8th Cir. 2004), and United States v. Cardena-Garcia, 362 F.3d 663, 665-66 (10th Cir. 2004)).  Because the panel in Rodriguez found no plain error under either test, it declined to address the issue any further.

7

1B1.3. Under the Guidelines, a defendant's base offense level and specific offense characteristics are determined, in part, from his offense of conviction, plus all relevant conduct. See U.S.S.G. § 1B1.1 cmt. n.1(H). A defendant's "relevant conduct" includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. §1B1.3(a)(1)(B).

We agree with the government and conclude that to apply the § 2L1.1(b)(7) enhancement it must be reasonably foreseeable to a defendant that his actions or the actions of any other member of the smuggling operation could create the sort of dangerous circumstances that would be likely to result in serious injury or death.[3] In reaching this conclusion, we reject Zaldivar's suggestion that § 2L1.1(b)(7) requires that the defendant's individual actions must be the proximate cause of the death or serious injury.

Here, Zaldivar's relevant conduct for sentencing purposes, including this ten-level enhancement, includes the reasonably foreseeable acts of his co-conspirator Cervantes, whose actions were the proximate cause of Garcia's death. See De La Cruz Suarez, 601 F.3d at 1221 ("If a defendant is aware of the scope of

---

[3] As the government pointed out at oral argument, the enhancement cannot be read so broadly to include a scenario in which a smuggled alien who cut his hand during the boat trip and later received surgery on that injury but died because the doctor who performed the surgery committed medical malpractice. While the alien's death presumably would not have happened but for the minor injury he sustained during the smuggling trip, it cannot be said that the death resulted from the circumstances surrounding and created by the smuggling operation itself.

8

a conspiracy outside of his individual actions, he may be held accountable for actions by co-conspirators even though he was not personally involved."). Moreover, it is not disputed that Garcia died as a result of blunt force trauma to his head that he sustained during the course of the Scarab's high speed flight from the Coast Guard during the alien smuggling operation. Thus, the pertinent question we must ask is whether it was reasonably foreseeable to Zaldivar that his co-conspirator Cervantes, who was captaining the Scarab, would have fled at a high rate of speed once this boat had been detected by the Coast Guard and that someone on that boat could have been seriously injured or have died as a result. If so, that conduct is attributable to Zaldivar as relevant conduct and is sufficient to support the application of § 2L1.1(b)(7)(D) to his sentence.

The district court, in applying this enhancement, found that Garcia's death was reasonably foreseeable to Zaldivar and his co-defendants. The court explained that the circumstances surrounding alien smuggling, including "when individuals undertake alien smuggling ventures on the high seas in an overcrowded boat with a lack of life preservers and a willingness to evade Coast Guard detection or apprehension," are ones that make it obvious to those involved that death or serious injury may occur.

We find no error in the district court's determination that Cervantes's actions

and Garcia's resulting death were reasonably foreseeable events to Zaldivar. Zaldivar agreed to be involved in and participated in what he knew to be the illegal transportation of thirty-two Cubans in an overcrowded boat that was designed to travel at high rates of speed. He knew that the boat was overcrowded and did not contain enough life preservers for all of its passengers. He knew that this boat was traveling in the dark of night and without its headlights on so as to avoid detection by the Coast Guard. He knew that two other boats were traveling ahead to draw the Coast Guard's attention to those boats and presumably allow the boat carrying all of the Cubans to get away if any of the boats were detected. He knew that this smuggling operation would require the boats to travel on the open seas for an extended period of time where ocean and weather conditions are uncontrollable and have the potential to deteriorate. Given these circumstances, we agree with the district court that it would have been reasonably foreseeable to Zaldivar that Cervantes would attempt to evade Coast Guard interdiction by fleeing at a high rate of speed once their boat had been spotted and that doing so with an incredibly overcrowded boat containing thirty-two passengers during the dark of night would create highly dangerous conditions that put all of the boat's passengers and crew at serious risk of injury or death.

Thus, because the actions of Zaldivar's co-conspirator were reasonably

10

foreseeable and it is not disputed that Garcia's death was caused by blunt force trauma that he sustained to his head during the boat's flight from the Coast Guard, we see no reversible error in the district court's application of the ten-level enhancement pursuant to § 2L1.1(b)(7)(D).

B.      Sentencing Reduction for "Other than for Profit"

Zaldivar also argues that the district court erred in failing to find that his involvement in the conspiracy was for a reason "other than for profit." The Sentencing Guidelines provide that a defendant's base offense level can be decreased by three levels where "the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child) . . . ." U.S.S.G. § 2L1.1(b)(1). The application notes to this provision further define "other than for profit" to mean that "there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens." Id. § 2L1.1, comment. n.1. It is Zaldivar's burden to prove that the Guidelines' section which would reduce his sentence is applicable to him. See United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989).

Based on this record we cannot state that the district court erred in denying Zaldivar's request to find that he committed the offense for a reason "other than for

11

profit." In support of the three-level reduction, Zaldivar argues that in his acceptance of responsibility statement and at his sentencing hearing he explained that he was involved in the smuggling operation for the purpose of bringing his wife and two daughters from Cuba to the United States and that he never received any money for his involvement in this conspiracy. Zaldivar's wife and daughters, however, were not on the boat and the only explanation Zaldivar offered for their absence was that he could not pick them up for "unknown reasons." At the trial of some of his co-defendants, two of the smuggled Cubans testified that they expected to pay for the trip to the United States. In addition, when the Cubans were originally picked up at sea by the Coast Guard some of them gave statements that they expected to pay between 5,000 and 10,000 Cuban pesos to an unknown person in Cuba for the trip. Thus, given the absence of Zaldivar's wife and children on the boat and the statements of the Cubans about their expectation to pay for the trip, we cannot say that the district court erred in denying Zaldivar a three-level reduction when calculating his base offense level.

**AFFIRMED.**