PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2987
_____

UNITED STATES OF AMERICA

v.

STEPHAYNE MCCLURE-POTTS,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA
(D.C. Civ. Action No. 1:16-cr-0303)
District Judge: Honorable Sylvia H. Rambo
_____

Argued September 26, 2018
_____

Before: AMBRO, CHAGARES, and GREENAWAY, JR.,
*Circuit Judges*.

(Opinion Filed:  November 8, 2018)

_____

OPINION

_____

Heidi R. Freese
Ronald A. Krauss
Frederick W. Ulrich [Argued]
Office of the Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
          *Counsel for Appellant*

Daryl F. Bloom
David J. Freed
Stephen R. Cerutti II [Argued]
Office of the United States Attorney
Ronald Reagan Federal Building, Suite 220
228 Walnut Street
Harrisburg, PA 17108
          *Counsel for Appellee*

GREENAWAY, JR., *Circuit Judge*.

Defendant Stephayne McClure-Potts appeals a five-month sentence rendered after pleading guilty to one count of Social Security Fraud, in violation of 42 U.S.C. § 408(a)(6), and one count of Harboring an Illegal Alien, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(2). For the following reasons, we will affirm.

2

## I.   FACTS

This case arises out of the personal relationship between defendant Stephayne McClure-Potts and Artur Samarin, a young man who entered into the United States without inspection from the Ukraine and ultimately settled in Harrisburg, Pennsylvania. In August of 2015, McClure-Potts contacted local police to report "Homeland Security issues" with Samarin, whom she claimed she and her husband were in the process of trying to adopt despite his being nineteen years of age at the time. PSR ¶ 5. She claimed that Samarin had recently been "speaking of Hitler against the Jews" and asserted that he may have stolen a rifle from his school. *Id*. McClure-Potts would go on to provide a birth certificate for Samarin indicating a birth year of 1992, as well as expired immigration visas and an application to change the nature of Samarin's visa.

Police investigated the reports and discovered that McClure-Potts had twice previously filed runaway reports regarding a minor son—Asher Potts—who supposedly was born on September 3, 1997. They also discovered that Samarin was posing as a minor named Asher Potts and attending John Harris High School in Harrisburg. The school provided a number of documents pertaining to Samarin, including a sworn statement from McClure-Potts dating from 2012 claiming that Samarin was born on September 3, 1997, as well as applications for free/reduced lunch and health benefits.

In an interview after the above discoveries, McClure-Potts explained that Samarin had come to the United States in 2012 via an exchange program and befriended her and her husband after he was assaulted by a group of "Russian boys." PSR ¶ 9. She also claimed that, as they assisted Samarin in

3

addressing his immigration issues at the time, he claimed to be only fourteen years old. She did provide a passport for Samarin indicating his birth year was 1992.

In an interview with authorities, Samarin explained that he had gotten to know McClure-Potts and her husband by visiting the convenience store where she worked. He said that he had expressed his desire to stay in the United States and that McClure-Potts and her husband offered to help him do so. According to Samarin, this assistance included their offer for him to live with them, their offer to change his birthdate to allow their adoption of him, to get him enrolled in school, and to retain an immigration attorney (albeit McClure-Potts took $2,000 from Samarin to hire the attorney). Samarin agreed and moved in with McClure-Potts and her husband.

Samarin contends that, once he moved in, the situation changed. According to him, he was told to cut all ties with his family, and his identification documents were taken from him. He also was purportedly forced to do household work, McClure-Potts's own college schoolwork, and to turn over to McClure-Potts and her husband any money he received from work or grants.

On July 17, 2014, McClure-Potts obtained a Social Security card issued under Samarin's new alias, Asher Potts, after going to the Social Security Harrisburg District Office by herself ten times. According to the PSR, during this time, McClure-Potts and her husband used the applied-for and ultimately secured Social Security number obtained for Samarin in the name of Asher Potts born in 1997 to procure $7,336 worth of credits on income tax returns and $13,653.28 in nutritional and health benefits between 2012 and 2015 that they were not entitled to.

4

On October 19, 2016, McClure-Potts was named, along with her husband, in an indictment filed in the United States District Court for the Middle District of Pennsylvania. The indictment charged McClure-Potts with one count of Social Security Fraud, in violation of 42 U.S.C. § 408(a)(6); one count of Harboring an Illegal Alien, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and (a)(2); and one count of Unlawful Conduct Respecting Documents in Furtherance of Forced Labor, in violation of 18 U.S.C. §§ 1589 and 1590. Pursuant to a plea agreement, McClure-Potts pled guilty to the Social Security Fraud and Harboring counts.

McClure-Potts filed objections to the Presentencing Investigation Report ("PSR"), including the two issues raised here on appeal: namely, the amount of the calculated loss and the refusal to grant an offense level reduction due to the claim that her fraud was committed "other than for profit." *See* PSR Addendum. The amount of loss calculated by the Probation Office—$20,989.28—had resulted in an increase of four offense levels, while the refusal to grant McClure-Potts's request for a reduction cost her a potential three-level reduction in total offense level.

At sentencing, the District Court adopted the PSR without change and sentenced McClure-Potts to five months in prison. This appeal followed.

## II.    **DISCUSSION**[1]

On appeal, McClure-Potts raises three arguments: (1) that she harbored Samarin "other than for profit" under U.S.S.G. § 2L1.1(b)(1) and therefore that she should have received a three-point reduction to her total offense level; (2) that the District Court clearly erred by crediting Samarin's testimony of the events over that of McClure-Potts; and (3) that the District Court mistakenly calculated the total loss that resulted from McClure-Potts's crimes and therefore erred by increasing her total offense level by four pursuant to U.S.S.G. § 2B1.1(b)(1)(C). For the reasons discussed below, we find none of these arguments to be persuasive. We will therefore affirm the District Court's judgment of conviction.

### A.    **U.S.S.G. § 2L1.1(b)(1).**

McClure-Potts contends that the District Court erred by not reducing her total offense level points by three pursuant to U.S.S.G. § 2L1.1(b)(1). "On appeal, [w]e review the District Court's interpretation of the Sentencing Guidelines *de novo*, and scrutinize any findings of fact for clear error." *United States v. Kluger*, 722 F.3d 549, 555 (3d Cir. 2013) (quoting

---

[1] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

*United States v. Aquino*, 555 F.3d 124, 127 n.5 (3d Cir. 2009)).[2] Section 2L1.1(b)(1) of the Guidelines provides:

> If (A) the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child), and (B) the base offense level is determined under subsection (a)(3), decrease by 3 levels.

U.S.S.G. § 2L1.1(b)(1). Prior to 1997, § 2L1.1(b)(1), Application Note One of that section read (in pertinent part):

> "For profit" means for financial gain or commercial advantage, but this definition does not include a defendant who commits the offense solely in return for his own entry or transportation.

U.S.S.G. § 2L1.1(b)(1), App. n.1 (1995). However, in 1997, the Sentencing Commission deleted the 1995 commentary definition of "for profit" and substituted it for a definition for the phrase "other than for profit." U.S.S.G. § 2L1.1(b)(1),

---

[2] To the extent that the District Court's decision can be construed as an application of the Guidelines rather than as an interpretation of them, then the standard of review is for abuse of discretion. *See Kluger*, 722 F.3d at 555 ("[W]e review the District Court's application of the Guidelines to facts for abuse of discretion."). However, which standard applies here is not critical to our decision, as we would affirm under either a de novo or abuse of discretion standard.

App. n.1 (1997) (henceforth "Application Note One"). Accordingly, Application Note One now provides:

> ***"The offense was committed other than for profit"*** means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens.

*Id*. According to the Sentencing Commission, the stated purpose of the amendment was to narrow the class of offenders who could benefit from § 2L1.1(b)(1) pursuant to the immigration laws:

> **Reason for Amendment:** This amendment implements section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104-208, 110 Stat. 3009, which directs the Commission to amend the guidelines for offenses related to smuggling, transporting, or harboring illegal aliens. Pursuant to the emergency amendment authority of that Act, this amendment previously was promulgated as a temporary measure effective May 1, 1997. This version of the amendment changes § 2L1.1(b)(1)(A)(pertaining to a reduction for non-profit offenses) to narrow somewhat the class of cases that would qualify for the reduced offense level under that provision. This amendment also makes a conforming change to § 5K2.0.

U.S.S.G., Amendment 561 (1997). This definition, which remains presently in effect, typically applies to cases in which a defendant is paid to smuggle, transport, or harbor one or more aliens. *See, e.g.*, *United States v. Chavez-Palacios*, 30 F.3d 1290 (10th Cir. 1994); *United States v. Puac-Zamora*, 56 F.3d 1385 (5th Cir. 1995); *United States v. Zaldivar*, 615 F.3d 1346 (11th Cir. 2010). Thus, as the Government concedes, "this case falls outside the most common class of cases where the application of this particular guideline becomes an issue – i.e., determining whether a defendant accepted payment in return for smuggling illegal aliens into the country." Gov't Br. at 16. At issue, therefore, is whether McClure-Potts's receipt of various government benefits—i.e., tax credits, social security, food/medical assistance, etc.—constitutes behavior "other than for profit"; if it does, then she should receive a reduction of three criminal points; otherwise, she cannot benefit from the provision.

McClure-Potts's primary contention is precisely that—courts deny the three-level reduction "in circumstances where the harboring was indeed 'for profit', where the record established a very specific *quid pro quo*: payment to the harboring defendant from the unlawful alien for the particular purpose of facilitating illegal entry."[3] Appellant Br. at 19. According to her, unlike those cases, "[h]ere, the record demonstrates that [she] did not harbor Samarin 'for profit', as

---

[3] As a mitigating factor regarding her sentencing, it is McClure-Potts's burden to demonstrate that she was entitled to the benefit of § 2L1.1(b)(1). *See Zaldivar*, 615 F.3d at 1352 ("It is [the defendant's] burden to prove that the Guidelines' section which would reduce his sentence is applicable to him.").

9

Samarin provided no *quid pro quo*; he gave nothing to her for the purpose of facilitating illegal entry—especially considering that all agree that he was already present in the United States when they met—or for any other reason, including his room, board, and all the other expenses Potts expended on his behalf." *Id*. at 20.

She also contends that, while her receipt of government benefits may have met the pre-1997 definition of private financial gain, they also meet the current and distinct definition of "other than for profit." *Id*. at 24. First, she explicitly avoided pleading guilty to harboring an alien for "commercial advantage and private financial gain," and that the Government specifically deleted this language—which appears in the plea agreement—from the indictment:

> The defendant agrees to plead guilty to Counts 1 and 2, as it relates solely to harboring aliens and not for the purpose of commercial advantage or private financial gain.

*Id*. at 22 (quoting App. 19). In her estimation, the distinction between "private financial gain" and "for profit" is significant because "[w]hile perhaps the benefits could be considered, theoretically, as some species of 'private financial gain'—the very language that the Government deleted from the indictment—there seems to be no precedent for characterizing receipt of these benefits on behalf of someone who appears to be a dependent as 'for profit'." Appellant Br. at 23. She relies on *United States v. Kim*, 193 F.3d 567 (2d Cir. 1999), where the Second Circuit found that the 1997 amendment to

10

Application Note One constituted a substantive change as opposed to a clarification of the definition's scope.[4]

---

[4] The Second Circuit explained:

> The 1997 amendments to § 2L1.1 were not accompanied by any statement that the Commission intended the change in Application Note 1 simply as a clarification. *See* Guidelines Appendix C, Amendment 543 (1997). Instead, the amendments made numerous changes in the guideline and its commentary, and the Commission characterized the changes, in bulk, as "implement[ing] section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104–208, 110 Stat. 3009–566, which directs the Commission to amend the guidelines for offenses related to smuggling, transporting, or harboring illegal aliens." Guidelines Appendix C, Amendment 543 (1997). We see nothing in this statement to suggest that the Commission amended Application Note 1 merely to clarify the Commission's original intent.

> Further, on its face, the 1997 change to Application Note 1 appears to effect a substantial change in scope rather than to clarify. Plainly, a "commercial advantage" may encompass more than a simple "payment or expectation of payment." Had it been the Sentencing Commission's original intent that the "for profit" concept be restricted narrowly to payment or expectation of payment, we doubt that the Commission would have chosen to express that restriction in terms so broad as "commercial advantage."

However, the language of § 2L1.1(b)(1) is expansive and is broad enough to cover McClure-Potts's conduct. That this case does not involve the typical *quid pro quo* or facts involving the typical § 2L1.1(b)(1) case does not, on its face, mean that the potential three-level reduction inures to her benefit. First, the text of the Application Note does not require that payment be made by the unlawful alien himself—it merely says that "other than for profit" means "that there was no payment or expectation of payment for the . . . harboring of any of the unlawful aliens." U.S.S.G. § 2L1.1(b)(1), App. n.1. Accordingly, McClure-Potts's argument that "Samarin . . . gave nothing to her for the purpose of facilitating illegal entry . . . or for any other reason" is irrelevant. Appellant Br. at 20. *See United States v. Al Nasser*, 555 F.3d 722, 733 (9th Cir. 2009) ("An 'offense was committed other than for profit' only if the offense itself was committed other than for profit, regardless of whether the particular defendant got, or expected to get, any of the money.").

Second, the dispositive interpretative term in Application Note One is "payment" because in order to determine whether McClure-Potts "profited" from her behavior, we must determine whether the government benefits that she received constitute "payment" or "expectation of payment" for "harboring" Samarin in her home. U.S.S.G.

---

In the circumstances, we are persuaded that the 1998 Guidelines reflect a substantive change to § 2L1.1 Application Note 1 rather than a clarification.

*Kim*, 193 F.3d at 578.

12

§ 2L1.1(b)(1), App. n.1.[5]  Since the term "payment" is not defined anywhere in U.S.S.G. § 2L1.1(b)(1), we must use the term's ordinary meaning.  *See United States v. Loney*, 219 F.3d

---

[5] The Government focuses on the plain meaning of the term "profit."  *See* Gov't Br. at 21-22.  In particular, it relies on the definition of "profit" found in *Webster's Third*, which reads as follows:

> 1: an advantage, benefit, accession of good, gain or valuable return esp. in financial matters, education or character development.

*Id.* at 22 (quoting *Webster's Third New International Dictionary* 1811 (3rd ed. 2002)).  The Government argues that this definition of profit "easily captures the benefits that McClure-Potts enjoyed as a result of her harboring Samarin" (presumably because it contains the word "benefit").  *Id*.

However, the Government focuses on the wrong interpretative word.  We need not consider the definition of "profit" in *Webster's Third* because Application Note One already contains a definition for "other than for profit."  *See Stinson v. United States*, 508 U.S. 36, 38, (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."); *United States v. Loney*, 219 F.3d 281, 284 (3d Cir. 2000) (stating that *only* "*undefined* terms" in the guidelines should be given their "meaning in ordinary usage" (emphasis added)).

13

281, 284 (3d Cir. 2000) ("[W]e should interpret undefined terms in the guidelines, as in statutes, using the terms' meaning in ordinary usage"). *Webster's Third* defines "payment" as:

> 1 : the act of paying or giving compensation : the discharge of a debt or an obligation . . . 2 : something that is paid : something given to discharge a debt or obligation or to fulfill a promise.

*Webster's Third New International Dictionary* 1659 (3rd ed. 2002). And Black's Law Dictionary defines "payment" as

> **1.** Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation. **2.** The money or other valuable thing so delivered in satisfaction of an obligation.

*Payment*, Black's Law Dictionary (10th ed. 2014). From these definitions, we gather that the tax and assistance benefits that McClure-Potts sought out, requested, and received were "payment" for her harboring Samarin because the Government, by providing such benefits, was "discharge[ing] . . . an obligation" that it owed to her.[6] *Id*.; *Webster's Third*

---

[6] Indeed, in *Goldberg v. Kelly*, the Supreme Court characterized the receipt of such benefits as a "right[]" that the Government owes to its citizens:

> It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts

14

*New International Dictionary* 1659 (3rd ed. 2002)). Furthermore, the PSR provides that McClure-Potts received additional benefits from Samarin himself, including doing household work in McClure-Potts's home, completing some of her college course-work for her, and turning over any money that he earned to her.

This interpretation is consistent with that of other courts of appeals, which have construed the term "payment" in Application Note One in a broad and flexible manner:

> According to the Sentencing Commission, "'The offense was committed other than for profit' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens." U.S.S.G. § 2L1.1 Application Note 1 ¶ 1. Perez-Ruiz received in-kind compensation-transportation from Arizona to Chicago-for his role in the offense. He contends that in-kind compensation cannot be "payment," but this is untenable. Compensation is payment, and

---

> of property. . . . 'Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity. It is only the poor whose entitlements, although recognized by public policy, have not been effectively enforced.'

397 U.S. 254, 263 n.8 (1970) (citation omitted).

whether in specie or in some other form does not matter. . . .

Perez-Ruiz valued the trip to Chicago. He received some "payment" for his acts, and as even a modest payment counts as "profit" the judgment must be affirmed.

*United States v. Perez-Ruiz*, 169 F.3d 1075, 1076-77 (7th Cir. 1999); *see also United States v. Juan-Manuel*, 222 F.3d 480, 484-85 (8th Cir. 2000) ("[W]e hold that the words 'payment' and 'expectation of payment,' as used in the November 1997 commentary, can refer to something other than money."). It is also consistent with the stated purpose of the 1997 Amendment to Application Note One, which was intended to "narrow somewhat the class of cases that would qualify for the reduced offense level under [§ 2L1.1(b)(1)]." U.S.S.G., Amendment 561 (1997).

Accordingly, we will affirm the District Court's finding that McClure-Potts did not qualify for the § 2L1.1(b)(1) three offense level reduction.

B. **Samarin's Testimony**

McClure-Potts contends that the District Court's factual findings—where the District Court credited Samarin's versions of the events rather than hers—was "clearly erroneous." Appellant Br. at 20.[7] According to her, "the District Court's factual findings were clearly erroneous as the

---

[7] "[W]e review the District Court's . . . findings of fact for clear error." *Kluger*, 722 F.3d at 555.

16

court reached its findings by crediting the self-serving statements of an illegal alien, who pleaded guilty in federal court of falsifying documents and lying to law enforcement." Appellant Br. at 20. She also contends that Samarin was not available for cross-examination, and that—although hearsay testimony may be introduced at a sentencing hearing—his testimony lacked the requisite "sufficient indicia of reliability to support its probable accuracy." *Id*. (quoting *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007)).

The District Court's findings, however, do not meet the clear error standard, which requires that its findings be either "completely devoid of minimum evidentiary support displaying some hue of credibility, or . . . bear[] no rational relationship to the supportive evidentiary data." *United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018) (quoting *United States v. Antoon*, 933 F.2d 200, 204 (3d Cir. 1991)). Here, the District Court provided the following reasoning for its findings:

> The Court obviously had to assess the credibility of the Defendants. And the Court accepts Samarin's versions of the events surrounding the relationship between the parties.

> The following reasons for accepting Samarin's version are as follows: One, Mrs. Potts has admitted that she lied to the Social Security Administration; two, she has three convictions for theft by deception; three, she has a conviction for bad checks, and the factual background for that offense shows an attempt to defraud another of property; four, when she reported Samarin's illegal status to the police, she lied about his

17

> stealing weapons from the school ROTC; five, the pictures of cards and notes that were exchanged between the parties appear to this person to be, in some instances, contrived; there are no dates on these exhibits and no foundation that Samarin in fact created them; six, Mrs. Potts did not report Samarin's true identity to the Dauphin and York County Assistance Offices. Mr. Samarin's version of events is corroborated by many of the documents in this case.

App. 134. The District Court's explanation reflects a sufficient consideration of the competing statements it was presented with, and sets forth an adequate justification for its findings. And while Samarin did engage in repeated instances of fraud and dishonest behavior, there is also little doubt that McClure-Potts did as well (especially in light of the fact that she pled guilty to Social Security Fraud). Given that the District Court found that Samarin's testimony was corroborated by the record, its findings were based on adequate evidence that met the requisite "minimal indicium of reliability beyond mere allegation." *Robinson*, 482 F.3d at 246. Accordingly, the District Court did not commit clear error by crediting Samarin's testimony over that of McClure-Potts.

### C.   U.S.S.G. § 2B1.1(b)(1)(C)

McClure-Potts's third and final claim on appeal is that the District Court erred in calculating a loss amount of $20,989.28 that, because it exceeded $15,000, resulted in a four-level increase to her total offense level pursuant to

18

U.S.S.G. § 2B1.1(b)(1)(C).[8] *See* Appellant Br. at 27-32. This loss amount consisted of a $7,336 loss from fraudulently obtained earned income tax credits and $13,653.28 in fraudulently obtained nutritional and medical assistance. "[W]e review the District Court's application of the Guidelines to facts for abuse of discretion." *Kluger*, 722 F.3d at 555 (quoting *United States v. Tupone*, 442 F.3d 145, 149 (3d Cir. 2006)).

### i. Food Stamps and Medical Assistance

McClure-Potts contends that, with respect to her defrauding the Government of food stamps and medical assistance benefits, "the 'offense' was *applying* for a false social security number, not *using* a false social security number" and that "[s]imply applying for a social security number under false pretenses does not imply that Potts knew that she could or would later get tax breaks and food stamps/assistance." Appellant Br. at 28. She accordingly puts forth four arguments, none of which we find to be persuasive.

First, she argues that the food stamps and medical assistance benefits do not count as losses for purposes of the Sentencing Guidelines calculation under § 2B1.1. "Actual Loss" is defined in the Guidelines as "the reasonably foreseeable pecuniary harm that resulted from the offense."

---

[8] Section 2B1.1(b)(1)(C) provides that, for offenses that include, *inter alia*, fraud and deceit, a four-level enhancement is added to a defendant's total offense level if the loss to the victim exceeded $15,000.

U.S.S.G. § 2B1.1, App. n.3(A)(i). And "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, App. n.3(A)(iv). In McClure-Potts's estimation, "there is nothing in the record to establish that [she] reasonably knew or should have known the potential results that could flow from the [fraudulent] application for the [social security] card." Appellant Br. at 29. However, her argument misrepresents the record: McClure-Potts ultimately used both the application for *and* the receipt of a Social Security number to obtain the tax and assistance benefits that she received. To the extent that she argues that she was never charged for using the fraudulently obtained Social Security number, it is well established that a district court can sentence someone based on criminal activity that was not charged in the indictment. *See, e.g.*, *United States v. Baird*, 109 F.3d 856, 869 (3d Cir. 1997) ("[I]t is clear that the Guidelines envisioned that sentencing courts would consider at least some conduct for which a defendant was not actually charged."); *United States v. Tidwell*, 521 F.3d 236, 250 n.9 (3d Cir. 2008) ("It is now well established in this circuit that facts that only enhance sentences within the range allowed by the jury's verdict (or guilty plea) need not be charged in an indictment or proven beyond a reasonable doubt." (citing *United States v. Grier*, 449 F.3d 558 (3d Cir. 2006) (en banc))). Furthermore, the argument that it was not "reasonably foreseeable" to McClure-Potts that she would use the fraudulent Social Security number to receive government benefits is, on its face, difficult to fathom.

Second, McClure-Potts contends that the purported losses that accrued from her obtainment of medical assistance benefits and food stamps—which is $13,653.28—cannot inure

20

to her detriment because they are unrelated to her federal offense.[9]  According to her, "these pending state charges are separate and distinct offenses from the instant federal offense and cannot in anyway be considered relevant conduct . . . because the Commonwealth is not a 'victim' as set forth in the indictment, or as defined in U.S.S.G. § 2B1.1, App. n.1; the only 'victim' is the Commissioner of Social Security."[10]  Appellant Br. at 30.  However, just because the Commissioner of Social Security was not the only victim does not excuse McClure-Potts's fraudulent actions from falling within the ambit of § 2B1.1.  Specifically, U.S.S.G. § 1B1.3(a)(3) provides that base levels like § 2B1.1 must account for "all harm that resulted from the acts or omissions . . . and all harm that was the object of such acts and omissions."  U.S.S.G. § 1B1.3(a)(3).[11]  Her receipt of the tax and assistance benefits

[9] McClure-Potts is currently charged with fraudulently obtaining food stamps and medical assistance in the Dauphin County Court of Common Pleas in Harrisburg, PA.

[10] The term "victim" under § 2B1.1 means "any person who sustained any part of the actual loss determined . . . ." U.S.S.G. § 2B1.1, App. n.1.  "Person" includes "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *Id*.

[11] The District Court relied on U.S.S.G. § 1B1.3—the Guidelines' relevant conduct provision—in setting the loss amount:

The Court considers these losses to be part of relevant conduct.  Under the sentencing guidelines, relevant conduct consists of all acts and omissions committed, aided, abetted, counseled, commanded, induced,

21

directly "resulted" from her filing of a fraudulent application to get that Social Security number – accordingly, it falls within the ambit of the relevant conduct that the District Court could permissibly assess at sentencing. *See, e.g.*, *United States v. Coe*, 79 F.3d 126, 127 (11th Cir. 1996) ("[T]he broad language of § 1B1.3(a) is clear: relevant conduct includes *all* acts that occurred during the commission of the offense.").

Third, she argues that the $13,653.28 in state assistance that she was not entitled to receive was disbursed to her from March 2013 to March 2016 (a period of thirty-six months), but that the offense conduct charged in the indictment ran only from January 15, 2013 to December 23, 2013 (a period of twelve months). Thus, she contends that the only amount of loss that can be attributed to the victim from her is $4,551.09 (which is one-third of $13,653.28). Again, pursuant to U.S.S.G. § 1B1.3(a)(3), the fraud that spanned through March 2016 constitutes relevant conduct. Indeed, we have previously stated in a case involving wire fraud that "[t]he determination of loss and other factors pertinent to a fraudulent scheme is never confined to the date of the charged mailing or wiring, but always encompasses all relevant conduct that was part of the same course of conduct or common scheme or plan." *United*

---

procured, or willfully caused by the Defendant, and all harm that resulted from the acts and omissions of the underlying crime, and all harm that was the object of such acts and omission. Each time the illegally obtained social security number was used was relevant conduct under the guidelines.

App. 132.

22

*States v. Siddons*, 660 F.3d 699, 704 (3d Cir. 2011) (internal quotation marks omitted).

Fourth, she contends that the amount of loss may not have been calculated properly because "the calculations do not make clear whether these alleged losses are only the additional payments she received as a result of adding Samarin, or if this amount includes payments she was entitled to receive, even without adding Samarin." Appellant Br. at 30.

However, it was McClure-Potts's burden to show that the amount of benefits proven by the Government was over-inflated.[12] *See United States v. McDowell*, 888 F.2d 285, 290 n.1 (3d Cir. 1989) ("The party challenging the [pre-sentence] report then has the burden of production"). Here, she has not produced evidence showing that the District Court

---

[12] "The Government bears the burden of establishing, by a preponderance of the evidence, the amount of loss for purposes of sentencing enhancement." *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008). Once the Government makes out a prima facie case of the loss amount, however, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate. *Id*. Here, the Government met its burden of providing a prima facie loss amount through the provision of two extensively supported reports from the Pennsylvania Office of the Inspector General, Bureau of Fraud Prevention and Prosecution on the fraud perpetrated by McClure-Potts and her husband.

miscalculated the amount, and therefore her argument is of no avail.

## ii. **Federal Tax Losses**

The PSR provides that Potts fraudulently received $7,336 between 2012 and 2015 in federal tax benefits. McClure-Potts repeats many of the same arguments above for why this amount should not be included in a loss calculation. She contends that (1) these losses are not "reasonably foreseeable pecuniary harm" that resulted from the offense (i.e., that she did not know or reasonably should have known that they would result from the offense); (2) the loss of the tax revenue accrued to the Commissioner of the IRS, not the Commissioner of Social Security; and (3) the loss figure of $7,336 spans 2012 to 2015, beyond the scope of the indictment.

However, for the reasons discussed above, these arguments fail because (1) it was reasonably foreseeable that she would defraud the government with a fraudulently obtained Social Security card; and (2) it is of no moment that the loss accrued to the Commissioner of the IRS or that the loss occurred beyond the scope of the indictment because the conduct still constitutes "relevant conduct" under U.S.S.G. § 1B1.3(a)(3). Accordingly, we reject these contentions and will affirm the District Court.

## III. **CONCLUSION**

For the aforementioned reasons, we will affirm the District Court's judgment of conviction.

24