[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12653

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DEYVIS BORROTO GIL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:22-cr-10002-JLK-1

_____

Before WILSON, LUCK, and TJOFLAT, Circuit Judges.

PER CURIAM:

Deyvis Borroto Gil appeals his conviction for conspiracy to encourage and induce aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) & (a)(1)(A)(v)(I).  He first argues that the District Court plainly erred at sentencing by failing to address him directly and provide him with an opportunity to allocute.  Second, he argues that the District Court erred by denying him a three-level reduction to his base offense level, pursuant to U.S.S.G. § 2L1.1(b)(1), which requires the court to apply the reduction if the defendant committed the immigration-smuggling offense other than for profit.  For the reasons that follow, we vacate Borroto Gil's sentence and remand to the District Court.

## I.

On February 3, 2022, a federal grand jury in the Southern District of Florida indicted Deyvis Borroto Gil with one count of conspiracy to encourage and induce aliens to enter the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) & (a)(1)(A)(v)(I) ("Count 1").[1]  Borroto Gil was also indicted on 20 counts of

---

[1] According to 8 U.S.C. § 1324(a)(1)(A), "Any person who . . . (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or (v)(I) engages in any conspiracy to commit

encouraging and inducing aliens to enter the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and (a)(1)(A)(v)(II) ("Counts 2 through 21").[2]

Borroto Gil—without a written plea agreement—pleaded guilty to Count 1. The government agreed to dismiss the remaining counts at sentencing, provided that Borroto Gil make appropriate disclosures to the probation officer during the preparation of his presentence report ("PSR"). The government also agreed to recommend a reduction in offense level for acceptance of responsibility. The Magistrate Judge overseeing the change of plea hearing recommended that Borroto Gil's plea be accepted.

According to the PSR, Borroto Gil is a Cuban national. He resided in Cuba until 2000, when he tried to immigrate to the United States via the Texas border and was briefly taken into immigration custody before being deported back to Cuba. In 2015, he made another attempt to immigrate to the United States via the Texas border, and this time was successfully admitted. Since arriving in the United States, he has resided in Miami, Florida. A name check with U.S. Immigration and Customs Enforcement ("ICE") revealed that Borroto Gil was issued a final order of removal on

---

any of the preceding acts . . . shall be punished as provided in subparagraph (B)."

[2] In addition to making it illegal to conspire to encourage or induce an alien to come to the United States, 8 U.S.C. § 1324(a)(1)(A)(v)(II) makes it a crime to "aid[] or abet[]" such encouragement and inducement.

4                    Opinion of the Court                    22-12653

January 27, 2022, has an outstanding warrant of removal, is classified as a Level 1 violator,[3] and is amenable to arrest for immigration violations.  According to the PSR, a review of the Bureau of Prisons SENTRY database showed an Immigration Detainer lodged on June 2, 2022.[4]

With respect to the charges against Borroto Gil, the PSR reported that on December 5, 2021, a Homeland Security aircraft observed a vessel approximately 20 nautical miles west of Anguilla Cay, Bahamas—an area known for alien smuggling.  The vessel was traveling northbound towards Islamorada, Florida.  Coast Guard officers boarded the vessel and observed Borroto Gil at the helm.  The officers also found 20 Cuban nationals onboard—none of whom had visas or other authorization to enter the United States.  All 21 individuals were taken aboard a Coast Guard vessel.

---

[3] A Level 1 violator is someone who has allegedly committed an offense ICE classifies as "Level 1," which includes serious state or federal crimes.  When ICE determines that an alien has been charged or convicted of a Level 1 offense that could result in removal, or when an alien who is already subject to removal is charged with a Level 1 offense, ICE will file an Immigration Detainer with the appropriate law enforcement agency.  ICE, *Secure Communities Standard Operating Procedures* 5, https://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf.

[4] An immigration detainer is a request lodged by ICE with another law enforcement agency, asking that agency to notify ICE before releasing a specific prisoner—who ICE has probable cause to believe is a removable non-citizen—from custody.  ICE, *Detainers 101* (Sept. 27, 2022) https://www.ice.gov/features/detainers.

Borroto Gil was arrested by the Coast Guard. Post-arrest, he waived his *Miranda* rights,[5] and then explained to law enforcement that he went to pick up his wife and daughter—as well as others. Borroto Gil stated that he had not seen his daughter for two years, and that a fisherman named "Chi chi" convinced him to go pick up his wife and daughter. The registered owner of the vessel organized the entire smuggling venture, along with other people from Florida. Borroto Gil was not paid to smuggle the aliens but was allowed to bring his wife and daughter from Cuba on the vessel.

According to Borroto Gil, two men had placed the vessel Borroto Gil captained in the water and prepared it with fuel. A fishing vessel had taken the aliens from mainland Cuba to Cayo Cristobal, an offshore island. When the aliens arrived, one of them called Borroto Gil to let him know they were ready to be picked up. When Borroto Gil arrived, the vessel was already in the water with supplies on board.

The PSR shows that, pursuant to U.S.S.G. § 2L1.1, the base level for a violation of 8 U.S.C. § 1324(a) is 12. Because the offense involved the smuggling, transporting, or harboring between 6 and 23 unlawful aliens, the offense level was increased by three levels under § 2L1.1(b)(2)(A). The PSR assessed two additional levels for intentionally or recklessly creating a substantial risk of death or serious bodily injury under § 2L1.1(b)(6), and another two levels

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

because Borroto Gil used a special skill in a manner that significantly facilitated the offense under § 3B1.3.  Borroto Gil's adjusted offense level was 19.  With a three-level reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) & (b), Borroto Gil's base offense level was reduced to 16.  Borroto Gil had zero criminal history points and a criminal history category of I.  Under the Guidelines, the imprisonment range for a total offense level of 16 and a criminal history category of I is 21 to 27 months.

Borroto Gil raised two substantive objections to the PSR, one of which is before us on appeal.[6]  As relevant here, Borroto Gil argued that he should receive a three-level reduction to his total offense level pursuant to U.S.S.G. § 2L1.1(b)(1).[7]  He argued that his participation in the offense was motivated solely by his desire to bring his wife and daughter to the United States and that his sole compensation was being able to bring his family to the United States at no cost.

The government responded that Borroto Gil's motivation does not negate that he received compensation for his services.

---

[6] The other objection, not before us on appeal, was that there was no evidence of use of a special skill in the commission of this offense, so the two-level enhancement pursuant to U.S.S.G. § 3B1.3 was not merited.  The District Court overruled this objection.

[7] Section 2L1.1(b)(1) states that if "the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child) . . . decrease by 3 levels."

According to the government, in exchange for transporting 18 other aliens to the United States, Borroto Gil was compensated by being permitted to bring his wife and daughter along—such transits to the United States have a monetary value in the thousands of dollars and thus constitute financial gain. The government further argued that § 2L1.1(b)(1) was not applicable, because it applies when the offense involves *only* the smuggling of the defendant's spouse and/or child. Here, Borroto Gil smuggled 18 additional unlawful aliens. The Probation Officer agreed with the government that § 2L1.1(b)(1) did not apply because "the *quid pro quo* agreement between the defendant and the unindicted co-conspirator(s) conveys that the defendant's services were in exchange for something of value . . . thereby eradicating the assumption that there was no gain or benefit for his services." PSR Addendum, Doc. 23-1 at 1–2.

At the sentencing hearing, the District Court overruled Borroto Gil's § 2L1.1(b)(1) objection. According to the Court, the record was "devoid of any proof that [Borroto Gil] did it for money," Sent'g Tr. Doc. 37 at 20, but "there was a substantial advantage [to Borroto Gil] . . . and therefore the three-level reduction should not be awarded." *Id.* at 24. After hearing sentence recommendations from both Borroto Gil and the government, the District Court imposed its sentence. According to the Court, its sentence was based on "the statements of all parties, the presentence report, the advisory guidelines and the [18 U.S.C. § 3553(a)] factors." *Id.* at 36. The Court sentenced Borroto Gil to 21 months' imprisonment,

followed by one year of supervised release. The District Court then dismissed the remaining charges, upon motion from the government.

Finally, the District Court asked if there was anything else to be done in this case. The government said "I don't know that the court inquired of the defendant whether he wished to make a statement to the court." *Id.* at 39. The Court asked the government to come closer so it could hear better, but instead the government responded that it had nothing further, and the Court ended the proceedings.[8]

Borroto Gil timely appealed. On appeal, he argues that (1) the District Court erred as a matter of law when it failed to address him at sentencing in order to allow him an opportunity for allocution and (2) the District Court imposed a procedurally unreasonable sentence when it failed to reduce his offense level by three levels under U.S.S.G. § 2L1.1(b)(1) because he did not commit the offense for profit. We address each argument in turn.

## II.

We review for plain error a district court's failure to afford a defendant the right to allocution if the defendant did not timely object. *United States v. Perez*, 661 F.3d 568, 583 (11th Cir. 2011).

---

[8] The AUSA realized that the District Court failed to afford Borroto Gil his right of allocution, as required by Federal Rule of Criminal Procedure 32(i)(A)(4)(ii). As such, she attempted to alert the District Court to its error.

Plain error lies only where "(1) there is an error in the district court's determination; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Clark*, 274 F.3d 1325, 1326 (11th Cir. 2001).

Federal Rule of Criminal Procedure 32 says: "Before imposing sentence, the court *must* . . . address the defendant personally in order to permit the defendant to speak or to present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii) (emphasis added). This is known as the defendant's right of allocution. This right affords a defendant "an opportunity to plead personally to the court for leniency in his sentence by stating mitigating factors and to have that plea considered by the court in determining the appropriate sentence." *United States v. Tamayo*, 80 F.3d 1514, 1518 (11th Cir. 1996). A defendant is generally "entitled to a presumption that he was prejudiced by the district court's failure to afford him his right of allocution, which will satisfy the plain error rule's third requirement, even if he received a sentence at the low end of his advisory guideline range." *United States v. Doyle*, 857 F.3d 1115, 1121 (11th Cir. 2017).

However, we "do not require the district courts to mechanically follow a script." *Perez*, 661 F.3d at 584 (citing *United States v. De Alba Pagan*, 33 F.3d 125, 129 (1st Cir. 1994) ("[W]e do not attach talismanic significance to any particular string of words. . . ."). The inquiry is whether "the district court's colloquy

with the defendant is the 'functional equivalent' of what Rule 32(i)(4)(A)(ii) prescribes." *Id.* at 585 (quoting *De Alba Pagan*, 33 F.3d at 129).

Here, the District Court plainly erred at sentencing by failing to directly address Borroto Gil and provide him with the opportunity to allocute. Nor was the functional equivalent of what Rule 32 requires afforded to Borroto Gil. This failure "constitutes plain error and a manifest injustice, requiring the vacation of [Borroto Gil's sentence] and the remand of his case for resentencing." *Perez*, 661 F.3d at 583.

### III.

"[We] review[] *de novo* the district court's interpretation of the guidelines and its application of guidelines to the facts." *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). The district court's factual findings are reviewed for clear error. *Id.* The proponent of a sentencing adjustment bears the burden of proving its applicability and establishing the facts necessary to support it by a preponderance of the evidence. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007). We review the procedural reasonableness of a sentence under a deferential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). A sentence may be procedurally unreasonable if the district court improperly calculates the guideline range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, sentences based on clearly erroneous facts, or fails to adequately explain its chosen sentence. *Id.*

We interpret the Sentencing Guidelines and accompanying commentary by applying traditional rules of statutory construction. *United States v. Gordillo*, 920 F.3d 1292, 1297 (11th Cir. 2019). Applying those rules, we first look to the plain language of the Guidelines or accompanying commentary. *Id.* Additionally, we may defer to the Guidelines's commentary if uncertainty exists in the guideline. *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc).

Section 2L1.1(b)(1) of the United States Sentencing Guidelines provides as follows: "If (A) the offense was committed other than for profit, or the offense involved the smuggling, transporting, or harboring only of the defendant's spouse or child (or both the defendant's spouse and child), and (B) the base offense level is determined under subsection (a)(3), decrease by **3** levels." U.S.S.G. § 2L1.1(b)(1) (emphasis in original).

Prior to 1997, Application Note 1 to § 2L1.1 read, in relevant part: "'For profit' means for financial gain or commercial advantage, but this definition does not include a defendant who commits the offense solely in return for his own entry or transportation." *Id.* § 2L1.1, cmt. (n.1) (1995). The current version of Application Note 1 to § 2L1.1 provides the following definition: "'**The offense was committed other than for profit**' means that there was no payment or expectation of payment for the smuggling, transporting, or harboring of any of the unlawful aliens." *Id.* § 2L1.1, cmt. (n.1) (1997) (emphasis in original). According to the Sentencing Commission, the stated purpose of the amendment was, *inter*

*alia*, "to narrow somewhat the class of cases that would qualify for the reduced offense level under that provision." U.S.S.G., Amendment 561 (1997).

Black's Law Dictionary defines "profit" as "[t]he excess of revenues over expenditures in a business transaction." *Profit*, Black's Law Dictionary (11th ed. 2019) ("Black's"). It defines "payment" as "1. Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation. 2. The money or other valuable thing so delivered in satisfaction of an obligation." *Payment*, Black's.

We have not yet directly addressed the issue of whether § 2L1.1(b)(1) may apply to a case in which the defendant received a non-monetary form of payment. In applying § 2L1.1(b)(1), we have generally considered whether there was evidence of a monetary payment or expectation of payment. In *United States v. Zaldivar*, the defendant argued that he should receive § 2L1.1(b)(1)'s three-level reduction because he was involved in a smuggling operation for the purpose of bringing his wife and children from Cuba to the United States, and he never received any money for his involvement in the conspiracy. 615 F.3d 1346, 1352 (11th Cir. 2010). We affirmed the denial of the reduction because (1) some of the Cubans who were picked up by the Coast Guard gave statements that they expected to pay some amount of money for the trip to an unknown person, and (2) Zaldivar's wife and children were not on the boat. *Id.*

Here, the District Court erred when it found that Borroto Gil did not qualify for a three-level reduction, pursuant to § 2L1.1(b)(1), on the basis that he received a substantial advantage or gain by bringing his wife and daughter to the United States.[9] The District Court's interpretation of § 2L1.1(b)(1)—that it looks at whether Borroto Gil received a substantial benefit or gain—is inconsistent with the guideline text, which instead asks the sentencing court to consider whether the offense was committed other than for profit.  Because the District Court applied an overly broad interpretation of § 2L1.1(b)(1), we vacate and remand as to this issue as well.

**VACATED AND REMANDED.**

---

[9] Both parties to this appeal agree as to this point, but disagree as to what the outcome of the appropriate inquiry should be.