**NON PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 23-2159 and 23-2171

_____

UNITED STATES OF AMERICA

v.

JASON C. WEIGAND
Appellant

_____

Appeals from the United States District Court for the Eastern District of Pennsylvania
(D.C. Nos. 5:17-cr-00556-001, 5:20-cr-00248-001)
District Court: Hon. Joseph F. Leeson, Jr.

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 11, 2025

Before: SHWARTZ, RESTREPO, and CHUNG, *Circuit Judges*

(Filed: June 2, 2025)

_____

OPINION[*]

_____

_____

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

RESTREPO, *Circuit Judge*.

Appellant Jason C. Weigand was convicted on all 30 counts across two consolidated cases, including convictions for aggravated identity theft and fraud offenses that resulted in substantial financial loss. Weigand now raises three issues on appeal: (1) the validity of his three aggravated identity theft convictions in light of *Dubin v. United States*, 599 U.S. 110 (2023), which was decided after Weigand's trial; (2) the District Court's application of a two-level sentencing enhancement for vulnerable victims; and (3) the District Court's calculation of the amount of loss caused by his crimes. For the following reasons, we affirm the judgments of conviction and sentence.

## I.

From approximately 2005 to 2019, Weigand, a financial advisor who surrendered his license in 2014, defrauded multiple clients of more than $574,000. The evidence at trial showed that Weigand impersonated clients, stole their identities, forged documents and signatures, fabricated financial statements, hacked email accounts, and engaged in various fraudulent activities to misappropriate client funds for his personal use. Aspects of this appeal centers around two victims—A.R. and A.H., both widows who experienced the sudden loss of their husbands.[1] Weigand had initially sold insurance to the victims and their spouses before the husbands' deaths, after which the widows entrusted him to manage their finances.

With respect to victim A.R., Weigand opened an account in her name with Charles Schwab, a financial services company, without her knowledge or permission in October 2012, using her

---

[1] To protect the victims' identities, we identify them using their initials.

date of birth and social security number. Weigand then made two phone calls to Schwab, impersonating A.R., and sent a fax to Schwab purporting to be from A.R., transmitting her identification documents to confirm her identity and fully activate the account. These actions formed the basis for Weigand's aggravated identity theft charges (with the predicate offense of wire fraud), which appeared on a 24-count Second Superseding Indictment entered on July 25, 2019.[2]

In the case of victim A.H., Weigand obtained $229,000 from her under the false pretense of investing the funds, but instead used the money for his personal and business purposes. His final misappropriation of her investment money occurred after he was on pretrial release for charges in earlier indictments. On August 18, 2020, a grand jury returned a six-count Second Indictment charging Weigand with mail fraud, wire fraud, and interstate transportation of stolen securities.

The jury convicted Weigand on all thirty counts charged in the consolidated indictments. The District Court calculated Weigand's Guidelines range at 159-240 months, applying a two-level enhancement for vulnerable victims and a fourteen-level enhancement based on an actual

---

[2] The prior indictments were in *USA v. Weigand*, No. 5:17-cr-556 (E.D.P.A. 2017) and included: (1) an October 2017, twenty-count indictment for mail, wire, and bank fraud, money laundering, aggravated identiy theft, and unauthorized access to a computer; and (2) a March 2019, twenty-one-count First Superseding Indictment that retained the original charges and added one additional bank fraud charge. The July 2019 Second Superseding Indictment retained all pending charges and added three new bank fraud charges. The Second Indictment was filed in *USA v. Weigand*, No. 5:20-cr-248 (E.D.P.A. 2020). These were consolidated for trial on defendant's motion and proceeded in tandem. *See* Order, *USA v. Weigand*, No. 5:17-cr-556 (E.D.P.A. Sept. 17, 2020), ECF No. 78.

loss of $574,508.89.  The Court sentenced Weigand to 160 months' imprisonment.  Weigand timely appealed.

## II. [3]

Weigand makes three arguments on appeal: (1) *Dubin v. United States*, 599 U.S. 110 (2023), requires this Court to vacate his aggravated identity theft convictions; (2) the District Court erred in applying a two-level sentencing enhancement for vulnerable victims; and (3) the District Court committed clear error in calculating the amount of loss caused by his crimes.[4]  We address each issue in turn.

### A. *Dubin v. United States*

Weigand argues that the recent Supreme Court decision in *Dubin* requires vacating his aggravated identity theft convictions at Counts 10, 11, and 12.  We disagree, and because Weigan did not advance this argument before the District Court, we review the District Court's jury instructions for plain error.  *See e.g.*, *United States v. Gladden*, 78 F.4th 1232, 1244–45 (11th Cir. 2023).

Under plain error review, Weigand must establish that (1) the court erred, (2) the error was plain, and (3) the error affected his substantial rights.  *Johnson v. United States*, 520 U.S. 461, 466–67 (1997).  If these three conditions are established, we may exercise our discretion to provide relief only where the error "seriously affect[s] the fairness, integrity or public reputation

---

[3] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.  This Court has jurisdiction over the final judgment under 28 U.S.C. § 1291.  This Court also has jurisdiction under 18 U.S.C. § 3742 to review the imposed sentence.

[4] Appellant states that he would like to preserve two other issues for a future appeal.  However, because he did not argue these issues in his opening brief, he has forfeited these claims.  *See Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187 (3d Cir. 2019).

of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). Here, the District Court instructed the jury that Weigand could only be found guilty of aggravated identity theft if he "used or possessed the means of identification during and in relation to" the wire fraud offenses, which was the predicate for his aggravated identity theft charges. Supp. App. 481. Because we find no error in Weigand's aggravated identity theft convictions to the jury instructions related thereto in light of *Dubin*, our analysis need not proceed beyond the first prong.

In *Dubin*, the Supreme Court examined a case involving a scheme for which the defendant was convicted of healthcare fraud and aggravated identity theft. *See Dubin*, 599 U.S. at 114–15. The defendant submitted fraudulent Medicaid claims that exaggerated services provided to patients. *Id.* Although the claims contained legitimate patient identification numbers, the core of the fraud involved misrepresenting the nature and extent of services rendered, not impersonating the patients or falsifying who received services. *Id.* The Government nevertheless secured an aggravated identity because the scheme involved the use of patient identifiers. *Id.* at 115.

The Supreme Court reversed this conviction, holding that § 1028A(a)(1) applies only in situations "where misuse of a means of identification is at the crux of the criminality." *Id.* at 120. The Court explained that aggravated identity theft "is committed when a defendant uses the means of identification itself to defraud or deceive." *Id.* at 123. Critically, the opinion distinguished between identity theft that "goes to 'who' is involved, rather than just 'how' or 'when' services were provided." *Id.* To illustrate this distinction, the Court provided an example of conduct that falls squarely within the statute's reach: "the pharmacist who swipes information from the pharmacy's files and uses it to open a bank account in a patient's name." *Id.* at 118. As the Court

5

explained, "[t[hat 'misuse of th[e] means of identification' would be 'integral to' what made the conduct fraudulent, because misrepresentation about who was involved was at the crux of the fraud." *Id.* (alteration in original) (quoting *United States v. Michael*, 882 F.3d 624, 629 (6th Cir. 2018)).

Applying these principles to the present case, we conclude that Weigand's conduct matches the type of identity misuse that *Dubin* confirmed remains covered by the statute. Like the hypothetical pharmacist in *Dubin*, Weigand misappropriated another person's identifying information to gain unauthorized access to financial systems. *See id.* On October 15, 2012, Weigand opened an account at Charles Schwab in A.R.'s name without her knowledge or consent, using A.R.'s actual name, date of birth, and social security number. He then engaged in a series of impersonations forming the basis of his aggravated identity theft convictions: in Count 10, using "the name and birthdate of A.R." during an October 17, 2012 telephone call to Schwab where he pretended to be A.R.; in Count 11, using "the name, date of birth, and social security number of [A.R.]" during an October 23, 2012 telephone call to Schwab where he again impersonated A.R.; and in Count 12, using "the name and social security number of A.R." in an October 23, 2012, fax to Schwab that included a forged letter from A.R., along with copies of A.R.'s driver's license and tax return. *See* No. 5:17-cr-00556, Dist. Ct. Dkt. 44 at 19, 22-24.

Unlike the defendant in *Dubin*, Weigand's misrepresentations went directly to the "who" element that the Supreme Court identified as central to the offense. *See Dubin*, 599 U.S. at 118. Weigand did not merely misrepresent the nature or extent of legitimate services he was providing to his client victim; rather, he misappropriated A.R.'s identity to deceive Schwab about who was opening, accessing, and controlling the account without her authorization. *See id.* at 126–27. This

6

deception about identity was not merely incidental to the fraud but constituted its very essence—Weigand could not have executed his scheme without representing himself as A.R. to Charles Schwab. Thus, the District Court committed no error and *Dubin* does not require us to vacate Weigand's aggravated identity theft convictions.

## B. The Vulnerable Victim Enhancement

Weigand also challenges the District Court's guideline calculation based on the vulnernable victim enhancement. We review the District Court's "application of the Guidelines to a specific set of facts" for clear error. *United States v. Caraballo*, 88 F.4th 239, 243-44 (3d Cir. 2023). We afford great deference to the trial court's factual determinations, particularly given the "factual nuance[s] [that] may closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details." *United States v. Zats*, 298 F.3d 182, 185 (3d Cir. 2002) (quoting *Buford v. United States*, 532 U.S. 59, 65 (2001)). Only if after "reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed," *Caraballo*, 88 F.4th at 244 (internal quotation marks omitted), will we find clear error.

Under § 3A1.1(b)(1) of the Sentencing Guidelines, a two-level enhancement applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." Our Court applies a three-part test, as articulated in *Zats*, to determine the applicability of the vulnerable victim enhancement, addressing whether: "(1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability facilitated the defendant's crime", meaning that there is "a nexus between the victim's vulnerability and the crime's ultimate

7

success." *Zats*, 298 F.3d at 186 (internal quotation marks and citation omitted). Here, the District Court had ample evidence to support all three prongs.

First, the District Court found that "at least two" of Weigand's victims—A.R. and A.H.— "were particularly vulnerable because of their emotional state following the sudden deaths of their husbands." Supp. App. 609. This finding is well-supported by the record. A.R. testified that when her husband died unexpectedly, she was "very numb." Supp. App. 50. By her admission, even years later, A.R. was "not versed in financial matters." Supp. App. 190. A.H. similarly testified that the period after her husband's sudden death was "very difficult." Supp. App. 341. Our Court in *Zats* emphasized that, in discussing who is a vulnerable victim, we examine "the individual victims' ability to avoid the crime rather than their vulnerability relative to other potential victims of the same crime." 298 F.3d at 188. Here, A.R. and A.H.'s emotional states following their husbands' deaths made them less able to protect their financial interests, and thus, made them particularly susceptible to Weigand's crimes.

Second, Weigand knew of their vulnerabilities. He attended both husbands' funerals and exploited both widows' vulnerabilities by inserting himself as their financial advisor shortly thereafter. The timing of Weigand's increased involvement in the victims' financial affairs immediately following their husbands' deaths suggests not merely knowledge of their vulnerability but intentional targeting. Weigand even instructed A.R. to keep their financial relationship secret from her father, further isolating her from potential oversight of his conduct. While *Zats* clarifies that the defendant need not have specifically "targeted" victims because of their vulnerability, *see* 298 F.3d at 188–89, the evidence here supports the District Court's finding that Weigand knew or should have known of his victims' particular vulnerability.

8

Finally, the victims' vulnerabilities facilitated Weigand's crimes by leading them to place unusual trust in him, which enabled his fraudulent scheme to continue undetected. A.R. testified that she viewed Weigand as an expert and trusted him to manage her money. A.H. similarly trusted Weigand as a professional in a field with which she was unfamiliar. As we noted in *Zats*, "[o]ur objective is to provide extra deterrence for defendants who are especially likely to succeed in their criminal activities because of the vulnerability of their prey." 298 F.3d at 188. Here, the victims' emotional vulnerability following the deaths of their spouses made them more susceptible to Weigand's fraudulent scheme, creating "a nexus between the victim's vulnerability and [Weigand's] ultimate success." *Id.* at 186.

Given the substantial evidentiary support and our deferential standard of review, we find no clear error in the District Court's application of the vulnerable victim enhancement.

### C. Loss Calculation

Weigand lastly appeals the District Court's calculation amount of actual loss sustained by the victims, which we also review for clear error. *United States v. Laird*, 67 F.4th 140, 143 (3d Cir. 2023). In our context, loss means "the loss the victim actually suffered." *United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). Once the Government makes a prima facie case of loss, the burden "shifts to the defendant to provide evidence that the Government's calculation of the loss is incomplete or inaccurate." *United States v. McClure-Potts*, 908 F.3d 30, 40 n.12 (3d Cir. 2018). Thus, a district court must make "a reasonable estimate of the loss[] based on available information in the record." *United States v. Shah*, 43 F.4th 356, 366 n.12 (3d Cir. 2022) (cleaned up).

Here, after considering testimony from both the Government and Weigand, the District

9

Court determined that Weigand caused an actual loss of $574,508.89 to his victims, resulting in a fourteen-level enhancement under U.S.S.G. § 2B1.1(b)(1). The Court based this finding on the testimony and analyses of government financial analyst Stacy Esimai, who traced client funds from deposit into Weigand-controlled accounts to other locations. In assigning the loss, Esimai categorized the use of funds as either for the benefit of the client, for the benefit of a different client, for Weigand's benefit, or for some unknown benefit. The District Court found Esimai's testimony "credible" and her analysis "an accurate reflection of the records she reviewed." Supp. App. 602–03.

Weigand challenges the District Court's loss calculation on several grounds, none of which has merit. First, he argues that the Government's loss calculation was flawed and that he was entitled to various offsets and credits. However, Esimai reviewed Weigand's offset claims at sentencing and explained why those claims should not be considered. The District Court found Esimai's testimony and explanation persuasive, and we defer to that finding.

Second, Weigand claims he was entitled to deductions for the value of services he rendered to his victims. The District Court rejected this argument because Weigand failed to tie any legitimate services to the specific funds he misappropriated. As noted in *United States v. Bryant*, the defendant bears the burden of proving offsets for any legitimate services he may have rendered. 655 F.3d 232, 254 (3d Cir. 2011).

Third, Weigand argues that *Banks* somehow overruled *McClure-Potts* regarding who bears the burden of challenging the Government's loss calculation. This argument also fails. *Banks* rejected the District Court's reliance on the sentencing guidelines commentary to interpret the unambigious language of the actual guideline, *see* 55 F.4th at 255–59, and had no effect on

*McLure-Potts* which remains the controlling law in this Circuit. Therefore, because the Government sufficiently made a prima facie showing of loss, Weigand bore the burden of providing the District Court with evidence that the loss calculation was incomplete or accurate. He did not do so.

The District Court carefully weighed the evidence of loss and properly concluded that the Government had established that the victims lost $574,508.89. Given our deferential standard of review, we we find no clear error in the District Court's loss calculation.

**III.**

For the foregoing reasons, we will affirm the judgments of conviction and sentence.